UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**JOHN & DEANN HENRY;**
**KAREN TALERICO;**
**MARK MATHENA & CATHERINE HUFFMAN;**
**ANDREA POLCARO;**
**ADAM F. & KORIE L. CROSSMAN;**
**MARK R. & NICHOLE J. GUSTAFSON,**

    **Plaintiffs,**       **CIVIL ACTION # 1:20-CV-12032**

**v.**

**CHARLES D. BAKER, in**      **COMPLAINT FOR DECLARATORY**
**his Official Capacity as**       **AND INJUNCTIVE RELIEF**
**Governor of Massachusetts; and**
**MONICA BHAREL, M.D., in her**
**Official Capacity as Commissioner of the**
**Massachusetts Dept. of Public Health,**

    **Defendants.**
_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    Plaintiffs JOHN & DEANN HENRY; KAREN TALRICO; MARK MATHENA & CATHERINE HUFFMAN; ANDREA POLCARO; ADAM F. & KORIE L. CROSSMAN; AND MARK R. & NICHOLE J. GUSTAFSON bring this Verified Complaint for Declaratory and Injunctive Relief against Defendants CHARLES D. BAKER in his Official Capacity as Massachusetts Governor; and MONICA BHAREL, M.D., in her Official Capacity as Commissioner of the Massachusetts Department of Public Health, and allege as follows.

## EXIGENCIES REQUIRING A TEMPORARY RESTRAINING ORDER

    1.    On March 10, 2020, Governor CHARLES D. BAKER issued Executive Order No. 591, declaring a State of Emergency, pursuant to Chapter 639 of the Acts of 1950 and Section 2A of Chapter 17 of the General Laws for the Commonwealth of Massachusetts, based on what he has

called a "public health emergency" caused by the SARS-COV-2[1] pandemic.

2.        On August 19, 2020, the State of Massachusetts, via the Massachusetts Dept. of Public Health Immunization Division, under the supervision of and at the direction of MONICA BHAREL, M.D., and pursuant to 105 CMR 220.000, announced that students between six months and thirty years of age must receive the influenza vaccine ("flu shot") by December 31, 2020, in order to be admitted to school or to childcare for the remainder of the 2020-2021 school year. This announcement was memorialized in a document entitled "Massachusetts School Immunization Requirements 2020-2021". This requirement will be referred to herein as the "flu shot mandate."

3.        While Massachusetts Dept. of Public Health Immunization Division documents reflect that a "religious exemption" to the flu shot mandate is still available, Massachusetts General Law Chapter 76, Section 15 states that: "*In the absence of an emergency* or epidemic of disease declared by the department of public health, no child whose parent or guardian states in writing that vaccination or immunization conflicts with his sincere religious beliefs shall be required to present [a physician's certificate confirming vaccination] in order to be admitted to school." Emphasis supplied. This effectively eliminates the religious exemption to the flu shot mandate.

4.        Plaintiffs bring this suit to challenge the statutory and constitutional authority of the flu shot mandate, which substantially infringes upon Plaintiffs' fundamental rights guaranteed by both the Massachusetts and United States Constitutions, including the right to religious freedom, the right of parents to make healthcare decisions for their children, and the right of children to an education.

5.        The public's interest will be advanced by granting the requested declaratory and injunctive relief because the public favors that the Governor act within his authority, comply will

---

[1] "COVID 19" is a classification, not a specific illness or virus.   However, such term may be used interchangeably with SARS-COV-2, the actual virus that causes the illness.

2

the applicable law governing the enactment of legislation, and uphold the Constitutional rights of Massachusetts citizens.

6.      Plaintiffs seek: a.) Declaratory judgment that enforcing the flu shot mandate against Plaintiffs and those similarly affected is unlawful and/or a violation of Plaintiffs' Constitutional and statutory rights; c.) that the Court grant preliminary injunctive relief and thereafter permanent injunctive relief enjoining the Defendants and those in concert or active participation with him from enforcing the flu shot mandate against Plaintiffs and those similarly situated; d.) that the Court award the Plaintiffs their attorneys' fees and costs as authorized by Fed. R. Civ. P. 54, 42 U.S.C. § 1988 and any other applicable law; and e.) that the Court award such other relief as this Court deems just and equitable.

## JURISDICTION AND VENUE

7.      This action raises federal questions under the United States Constitution, and is brought pursuant to 42 U.S.C. § 1983.

8.      The Court has jurisdiction over Plaintiffs' federal claims under the United States Constitution, Article II, Sec. 2, and 28 U.S.C. §§ 1331 and 1343.

9.      The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

10.      The Court has authority to grant the requested declaratory relief under 28 U.S.C. § 2201 and 2202, and the requested temporary restraining order and injunctive relief pursuant to Federal Rule of Civil Procedure 65.

11.      The Court is authorized to grant the Plaintiffs reasonable costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and M.G.L. c. 12 § 11I.

## THE PARTIES

12.      Plaintiff JOHN & DEANN HENRY are residents of Rockland, Massachusetts, and are the parents of H.E.H., age 11, F.A.H, age 15 (and who has substantial special needs), J.H.H age 16 and G.A.H. age 17, all of whom are subject to the flu shot mandate.

13.      Plaintiff KAREN TALAICO is a resident of Stoneham, Massachusetts, and is the parent of S.T, age 16, N.T, age and 15, A.G.T. age 10, all of whom are subject to the flu shot mandate.

14.      Plaintiff MARK MATHENA & CATHERINE HUFFMAN are residents of New Bedford, Massachusetts, and are the parents of L.D-C.M., age 3 (who is Day-Care and has special needs) and L.M.M. age 5, both of whom are subject to the flu shot mandate.

15.      Plaintiff ANDREA POLCARO is a resident of Medford, Massachusetts, and is the parent of L.E.P. age 13, Z.J.P. age 7 and T.T.P. age 5, all of whom are subject to the flu shot mandate.

16.      Plaintiff ADAM F. & KORIE L. CROSSMAN are residents of Marlborough, Massachusetts, and are the parents of T.M.C. age 5 and O.M.C. age 8, both of whom are subject to the flu shot mandate.

17.      Plaintiff MARK R. & NICHOLE J. GUSTAFSON are residents of Spencer, Massachusetts, and are the parents of H.R.G., age 15, A.A.G., age 14, M.M.G., age 10, B.M.G., age 9, J.R.G. age 7, E.R.G. age 6 and J.R.G. age 4, all of whom are subject to the flu shot mandate..

18.      Defendant, CHARLES D. BAKER ("Governor Baker") is Governor of the Commonwealth of Massachusetts, and is sued in his official capacity because he is responsible for declaring, enacting, and enforcing the Executive Order and the flu shot mandate at issue herein.

19.      Defendant MONICA BHAREL, M.D., is the Commissioner of the Massachusetts

4

Department of Public Health, and is sued in her official capacity because she is responsible for the creation, promotion, and implementation of the flu shot mandate.

## STANDARD OF REVIEW

20.        This is a case about who has the proper authority under the Constitution to make health care determinations for children: the parents, or the State. The case also contemplates the highly-protected fundamental rights to religious freedom and to an education. Therefore, Plaintiffs assert that the correct Standard of Review for Plaintiffs' Claims is Strict Scrutiny: any regulation that interferes with these rights must be based on a compelling government interest, and the regulation must be narrowly tailored to achieve that interest.

## INTRODUCTION AND BACKGROUND

21.         The flu shot mandate requires nearly 950,000 students enrolled in an approximate total of 1,854 schools in 404 school districts, and the over 350,000 children located in over 7,000-day care facilities[2] to obtain a medically unnecessary flu vaccine by January 1, 2021 as a condition of continued school enrollment and day care enrollment.

22.        Students between the ages of six months and thirty years must receive a flu shot by December 31, 2020 in order to complete the 2020-2021 school year, unless a medical exemption is provided.

23.        Because this order was given during a state of emergency, there are no religious exemptions.[3]

---

[2] Unless otherwise noted, data comes from a Fact Sheet is provided by Child Care Resource and Referral Agencies for Child Care Aware® of America's 2018 State Fact Sheet Survey. Data reflects the 2017 calendar year for the State of Massachusetts.

[3] While Massachusetts Dept. of Public Health Immunization Division documents reflect that a "religious exemption" to the flu shot mandate is still available, Massachusetts General Law Chapter 76, Section 15 states that: "*In the absence of an emergency* or epidemic of disease declared by the department of public health, no child whose parent or guardian states in writing that vaccination or immunization conflicts with his sincere religious beliefs shall be required to present [a physician's certificate confirming vaccination] in order to be admitted to school." Emphasis

24.     Kindergarten through twelfth grade ("K-12") students who are homeschooled, and higher education students who are completely off-campus and engaged in remote learning only, are exempt. However, students in districts and schools that are using an entirely remote education model ("eLearning", or online school) are not exempt

25.     This new flu shot mandate is in addition to existing vaccine requirements for all those attending child care, preschool, K-12, and colleges and universities in Massachusetts for those individuals under age thirty.

26.     This regulation was passed not as an act of the legislative will of the people, but by fiat by an executive branch agency acting as both legislature and executive to impose a law that interferes with a fundamental right to religious freedom, the right of children to attend school, and the fundamental rights of parents to make medical decisions on behalf of their children.

27.     Governors wield state police power when confronting a health crisis. However, the deployment of police powers to administer health, safety, and welfare matters does not obviate state officials' unequivocal duty to safeguard civil liberties. Any legitimate action that infringes upon civil liberties must closely target the root of the crisis. Executive orders, not supported by legislative vote, especially those that interfere with personal and fundamental rights, must be clearly written and respectful of constitutional safeguards and due process and must satisfy strict scrutiny.

28.     The flu shot mandate requires children as young as six (6) months old to receive a flu shot in order to attend school, whether they attend online school, in-person school, or day care, in spite of little to no scientific evidence to support that these same individuals are contributing to

---

supplied. This effectively eliminates the religious exemption to the flu shot mandate.

spreading the SARS-COV-2 virus.[4]

29.        Further, the imposition of a flu shot mandate for minor children does not serve a

rational purpose because the policy does not, and cannot, meet the policy objectives proposed by

this policy (e.g. to stop the spread of SARS-COV-2).[5]

30.        The purported purpose of the flu shot mandate is to diminish the spread of COVID-

19 by decreasing the likelihood of a flu epidemic that, if it occurs, could weaken children's immune

systems, theoretically making children more susceptible to catching and spreading COVID-19.

This purported purpose is not founded in fact or science.

31.        This lawsuit seeks to protect children from irrational policy-making that purports

to protect children, but in reality, provides very little, if any, protection and what little protection

it might provides is at the cost of unconstitutional interference with students' and parents' rights.[6]

## ARGUMENT

### I.        THE FLU SHOT MANDATE CANNOT ACCOMPLISH ITS STATED GOALS

32.        The justification for the flu shot mandate as suggested in the Department of Public

---

[4] A study by the Netherlands' National Institute for Health (RIVM) published on Wednesday, July 15, 2020, concluded that children under the age of 12 play little role in transmitting the new coronavirus.  The study in the country's leading medical journal Nederlands Tijdschrift Voor Geneeskunde followed the progress of the disease in 54 families, including 227 people in all.  Studies in other countries have previously found that children are less often infected by the virus and, once infected, less often become seriously ill.

[5] Arnaud Fontanet, an epidemiologist at the Pasteur Institute, and his colleagues started an investigation in Crépy-en-Valois in late March to see whether they could piece together the virus' reach in the town and its schools.   In six elementary schools, they found a total of three children who had caught the virus, likely from family members, and then attended school while infected. But, as far as the researchers could tell, those younger children didn't pass the virus on to any close contacts.   "It's still a bit speculative," says Fontanet, who shared results from the high school on 23 April and from the elementary schools on 29 June, both on the preprint server medRxiv.  Children younger than 11 or 12, on the other hand, "probably don't transmit very well. They are close to each other in schools, but that is not enough" to fuel spread.

[6]  As of this writing, and according to the American Academy of Pediatrics, the following statistics concerning COVID-19 are published:   Out of a children population of 77.9 million, the overall rate of COVID-19 in children is 661 cases per 100,000 children in the population

Health Order is that ameliorating the flu and flu like conditions will have a positive impact should there be a second wave of COVID-19. This assumption is not well-founded.

**A.  There Is Scant Evidence to Support the Idea that Children are COVID-19 Vectors.**

33.        The Center for Disease Control ("CDC") has made clear that "[s]chools are an important part of the infrastructure of communities and play a critical role in supporting the whole child, not just their academic achievement."[7]  Nowhere in the guidance provided to local schools by the CDC is any information about compelling students to receive a flu vaccination.

34.        The flu shot mandate is irrational because it does not protect students or others from the state's policy to suppress the spread of SARS-COV-2.  To contrary, all evidence suggests that children are less susceptible to catching COVID-19, or spreading it, and on the rare occasions that they contract COVID-19, received the virus from adults, rather than spreading COVID-19 to one another or to other adults.[8]  A flu vaccination does nothing to influence these underlying facts

---

[7]  Preparing K-12 School Administrators for a Safe Return to School in Fall 2020.  Guidance from the CDC to school Districts.

[8] How easily children catch the disease?   On this front, we have five studies (three published and two pre-print) to help inform us. These studies all look more-or-less at the same thing, which is contact tracing. From cases that have been confirmed positive (an index case), they trace back all the people who that case has been in contact with over the recent past and test all of them for COVID-19 to see how many of them caught the illness from exposure to that index case. The proportion of people who have had contact that subsequently became infected is referred to as the Attack Rate (AR). Broadly speaking contacts can be split into two groups: household and non-household (this is important as obviously you are much more likely to transmit to someone in your house). We can also split them up according to age, and see if there is any difference in the number of children who catch the illness compared to adults.

A study from Shenzhen in China was the first to be released in pre-print in March and is now published in the Lancet ID. This study assessed 1286 contacts of 391 initial cases and showed children had a similar attack rate to the population average (7.4% vs 7.9%), but interestingly were much less likely to be symptomatic. This finding caused a lot of concern, but more data has emerged since.

A pre-print study from Japan was released shortly after. They examined 2496 contacts of 313 domestically acquired cases and found a much lower attack rate in children (7.2% males, 3.8% females) compared to adults (22% in people aged 50 -59 years).

Another pre-print study from Guangzhou in China examined 2017 close contacts of 212 confirmed cases. The overall attack rate was 12.6%, however, the attack rate in children was 5.3%. They calculated an odds ratio of acquiring infection in children of 0.27 (0.13 – 0.55) compared to adults >60 years of age.

whatsoever.

35.     The evidence in fact points out that minor children rarely contract COVID-19.[9]  On those occasions when a child contracts COVID-19, the symptoms are often relatively minor, and rarely if ever led to death.[10]  In point of fact, the science indicates that the flu is up to three (3) times more deadly to minor children then COVID-19.[11]

36.     Scientists are yet to find a single confirmed case of a teacher catching coronavirus from a pupil anywhere in the world, according to Dr. Mark Woolhouse, an infectious disease epidemiologist at Edinburgh University.

---

A study published in Clinical Infectious Diseases assessed household contacts in particular. They assessed 392 contacts of 105 index cases in Wuhan, China (they had more stringent eligibility criteria to ensure they had correctly identified the index case in the household i.e. the person who brought the infection in). Of the 100 contacts under 18 years of age, only four became infected. This was compared to an attack rate of 21.9% among adult household contacts (making an overall attack rate of 16%).

A further study published in Science included some far-reaching assessments of transmission, but for our purposes, we will look at their findings regarding secondary attack rates in children. This was a contact tracing study from the Hunan CDC in China. They assessed 114 clusters (some clusters had more than one index case) and 7375 contacts. A regression analysis to adjust for other factors that influence AR (the type of transmission, travel history, etc) to determine the odds of becoming infected at different age groups. They found an odds ratio of 0.34 (0.24–0.49) for children under 14 years, compared to the reference group of 15-64 years (consistent across models).

[9] Iceland tested 6% of their entire population and found dramatically lower numbers of cases in children, including 6.7% of children under 10 positive in "targeted testing" (symptomatic or high risk due to contacts) compared to 13.7% of those 10 and older, and found 0 children under 10 years positive in population screening (by invitation) compared to 0.8% of those over 10 years.

The Italian principality of Vo tested >85% of their population following their first death from COVID-19, and found no positive cases in children despite 2.6% of the population being positive. This finding was repeated when they tested again two weeks later – despite a number of children living in households with confirmed positive contacts.

Finally, a study in The Netherlands is undertaking community serology testing (looking for antibodies against SARS-CoV-2 as evidence of current or previous infection) and has released preliminary results. They have found 4.2% of adults are positive compared to 2% of those aged <20 years.

[10] On April 6, the C.D.C. published preliminary findings on pediatric coronavirus cases in the United States. According to the report, 2,572 cases occurred in children younger than 18, and those children were significantly less likely to become seriously ill from the virus than American adults were. They also appeared less likely than adults to develop the main coronavirus symptoms like fever, cough or shortness of breath.

[11]  According to the CDC, as of August 14, 2020, there were 169 Pediatric deaths due to the Flu.   There has been a total of 49 deaths of minors under the age of 15 due to COVID 19.

37.      Professor Woolhouse, a member of the UK government's scientific advisory group, Sage, said that in hindsight closing schools in March was probably a mistake, but the limited role children play in spreading the virus only became clear further along the infection curve.

38.      Dr. Woolhouse is quoted as saying: "One thing we have learnt is that children are certainly, in the five to 15 brackets[12] from school to early years, are minimally involved in the epidemiology of this virus."[13]

**B.  The Flu Shot Has No Substantial Effect on SARS-COV-2 Susceptibility.**

39.      Flu shots often do not address the flu virus that is prevalent in any given year.   A 2012 meta-analysis found that flu vaccination was effective 67 percent of the time; the populations that benefited the most were HIV-positive adults aged 18 to 55 (76 percent), healthy adults aged 18 to 46 (approximately 70 percent), and healthy children aged six months to 24 months (66 percent).[14]

40.      Influenza vaccines generally show high efficacy, as measured by the antibody production in animal models or vaccinated people.[15]  However, studies on the effectiveness of flu vaccines in the real world are difficult; vaccines may be imperfectly matched, virus prevalence varies widely between years, and influenza is often confused with other influenza-like illnesses.

---

[12]   A peer review study published in the journal Nature Medicine found that children and teenagers are only half as likely to get infected with the coronavirus as adults age 20 and older, and they usually don't develop clinical symptoms of covid-19, the disease caused by the virus.   The study, is based on a survey of six nations: Canada, China, Italy, Japan, Singapore and South Korea. The researchers developed mathematical models to interpret the demographic patterns of covid-19 cases in those countries.   Age-dependent effects in the transmission and control of COVID-19 epidemics Nicholas G. Davies, Petra Klepac, Yang Liu, Kiesha Prem, Mark Jit, CMMID COVID-19 working group & Rosalind M. Eggo Nature Medicine (June 16 2020)

[13]   School closures 'a mistake' as no teachers infected in classroom:  The Times of London, published 22 July 2020.
[14]  Osterholm MT, Kelley NS, Sommer A, Belongia EA (January 2012). "Efficacy and effectiveness of influenza vaccines: a systematic review and meta-analysis". The Lancet. Infectious Diseases. 12 (1): 36–44. doi:10.1016/s1473-3099(11)70295-x. PMID 22032844

[15]   Relying on antibody production as a measure of vaccine effectiveness is in great scientific dispute.

41.     Michael Osterholm, who led the Center for Infectious Disease Research and Policy 2012 review on flu vaccines, recommended getting the vaccine but criticized its promotion, saying, "We have overpromoted and overhyped this vaccine...it does not protect as promoted. It's all a sales job: it's all public relations".[16]

**C. There Is No Logic Whatsoever As To Who Is And Is Not Mandated To Get A Flu Shot Under the Flu Shot Mandate.**

42.     There is no rationale whatsoever given as to why students who are enrolled in eLearning require a flu shot, while their parents, who live in the same home, are not impacted by this mandate.

43.     There is no explanation as to how a student engaged at home in eLearning, who is mandated to receive the flu shot, is in any way different from a student who is home-schooling, and is exempt from the mandate.

44.     No rationale provided by the State Department of Public Health adequately explains how a student in his own home enrolled in eLearning impacts in the slightest way whatsoever the stated policy goals.

45.     It makes no sense, under any level of scrutiny, to require children who are engaged in eLearning in their own homes to get a flu shot if they are, by definition, not attending school.

46.     There is no rationale that supports the arbitrary cut-off age of thirty, and the exemption of all students over thirty from the flu shot mandate. This is particularly nonsensical as older people tend to be more susceptible to both the flu and the COVID-19 virus.

**D. "Freeing Up Hospital Beds" Is Not A Rational Justification for the Flu Shot Mandate.**

---

[16] Rabin RC (November 5, 2012). "Reassessing flu Shots as the Season Draws Near". The New York Times. Archived from the original on November 10, 2016. Retrieved December 30, 2016. 'We have overpromoted and overhyped this vaccine,' said Michael T. Osterholm, director of the Center for Infectious Disease Research and Policy, as well as its Center of Excellence for Influenza Research and Surveillance. 'It does not protect as promoted. It's all a sales job: it's all public relations.'

47.      One stated rationale behind the flu shot mandate is that if all members of the Massachusetts public school and day care school community receive a flu shot, it might free up some hospital beds, should there be a bad flu season, and if there is a bad second wave of the COVID-19 pandemic .[17] This is based on the tacit but unlikely and unsubstantiated assumption that giving the flu vaccine to over one million school-age children will have a meaningful effect on the hospital bed needs for 6.9 million citizens of Massachusetts.

48.      There are a few described studies which suggest that the flu shot reduces flu hospitalizations and the level of flu sickness in some groups like seniors and pregnant women, and mandating a flu shot on the entire student population of Massachusetts will do nothing to free up hospital beds if there were to be a hospital bed shortage during any "second wave" of influenza illnesses (or the lessening the spread of SARS-COV-2) that may occur.[18]

**E.  The Best Evidence Indicates that the Flu Shot Does Not Reduce Flu Hospitalizations.**

49.      As set forth in the Declaration of Peter Gøtzsche, a 2018 review of 52 randomized clinical studies involving 80,000 patients demonstrated that the flu shot did not increase hospital bed availability. Gøtzsche concludes that the "hospital bed use in the Executive Order as a justification for the vaccine mandate amounts to 'scientific misconduct' according the definition established by the US Office of Research Integrity." (*Id.* at page 4 para. 12).

**F.  The Feared Hospital Bed Shortage is Speculative, and Contrary to the Best Available Data.**

50.      According to the most recent data on hospital beds usage, the flu hospitalization

---

[17] "Every year, thousands of people of all ages are affected by influenza, leading to many hospitalizations and deaths," said Dr. Larry Madoff, Medical Director, DPH's Bureau of Infectious Disease and Laboratory Sciences. "It is more important now than ever to get a flu vaccine because flu symptoms are very similar to those of COVID-19 and preventing the flu will save lives and preserve healthcare resources."
[18] Dr. Gøtzsche Declaration at page 4, para. 9 to page 5.

rates during the 2016–2017 and 2017–2018 influenza seasons were approximately 12.2 and 20.4 influenza hospitalizations per 100,000, respectively, which did not overburden hospitals. Assuming worst case COVID-19 numbers (using data to date), Massachusetts has not exceeded more than 10 hospitalizations per 100,000/week, since schools reopened. Therefore, even at a peak flu rate, plus the average COVID-19 hospital rate, hospital bed utilization is still much less than the hospital bed availability per 100,000 in the State of Massachusetts. Therefore, the flu shot mandate's stated rationale (the need to free up hospital beds) is not borne out by the facts.

### G. There is Suggestive Evidence that the Flu Shot Could Cause More Harm During This Pandemic.

51.     A Department of Defense ("DOD") observational study published in early January, 2020, is the only actual scientific study currently available regarding the relationship between the flu vaccine and coronavirus susceptibility.[19]

52.     The study compared respiratory virus status among DOD personnel based on their influenza vaccination status. Here is the author's conclusion: "Receipt of influenza vaccination was not associated with virus interference among our population. Examining virus interference by specific respiratory viruses showed mixed results. Vaccine derived virus interference was significantly associated with coronavirus and human metapneumovirus; however, significant protection with vaccination as associated not only with most influenza viruses, but also parainfluenza, RSV, and non-influenza virus coinfections." *Id.*[20]

---

[19]  A study published in the Journal of Virology in 2011, found the seasonal flu vaccine weakens children's immune systems and increases their chances of getting sick from influenza viruses not included in the vaccine.  *See* https://pubmed.ncbi.nlm.nih.gov/21880775/.  In addition, a 2012 study in the journal Clinical Infectious Diseases, which found that children receiving inactivated influenza vaccines had a 4.4. times higher relative risk of contracting non-influenza respiratory virus infections in the nine months following their inoculation.  *See* https://www.ncbi.nlm.nhi.gov/pmc/articles/pmc3404712/#!po=31.2500.

[20]This study was published in early January 2020, Recently, the author wrote that the positive virus interference results (36% increased risk/association between the flu vaccine and coronavirus) might not apply to the "novel" pandemic coronavirus." Wolff, G (2020). Letter to the Editor. Vaccine;38(30):4651.

53.       An additional medical paper, titled "Association Between Influenza Vaccination Rates and SARS-CoV-2 Outbreak Infection Rates in OCED Countries" was published June 24, 2020 and updated October 8, 2020 by Andreas Martin Lisewski of Jacobs University, Germany. (The "Lisewski Paper.")

54.       The Lisewski Paper makes the following observation:

> A different category of potential risks factors for SARS-CoV-2 infection itself might arise from a phenomenon known as vaccine associated virus interference. It refers to the situation where within a patient cohort active vaccination against one specific pathogenic virus, when compared to an unvaccinated control group, may actually increase the risk of infection and morbidity through other viruses that were not targeted by the vaccine tested. For viral infections of the respiratory tract, there has been prior evidence that, in controlled patient cohorts, the influenza vaccine may be associated with virus interference, and in particular with an increased risk of coronavirus infection.

55.       The Lisewski Paper goes on to note that "[t]hese early observations from the first wave of the COVID-19 pandemic support the hypothesis that influenza vaccination coverage is a risk factor associated with higher infection rates through SARS-CoV-2," possibly because "vaccinated patients do not reach the same level of non-specific immunity following natural infections."

56.       In short, a great deal of scientific thought and writing conclude this mandate is bad health policy and in a time of a pandemic may cause more or much more harm than good, and that the stated justification of 'free up hospital beds' is inconsistent with the best available evidence.

## II.   THE FUNDAMENTAL RIGHT TO AN EDUCATION IN MASSACHUSETTS

### A.  The History of the Fundamental Right to Education in Massachusetts

---

doi.org/10.1016/j.vaccine.2020.04.016.

57.      On April 14, 1642, the Massachusetts Bay Colony passed the first law in the New World requiring that children be taught to read and write. Concerned that parents were ignoring the first law, in 1647 Massachusetts passed another one requiring that all towns establish and maintain public schools. Colonial Massachusetts was among the very first places in the world to make the education of young people a public responsibility. The English Puritans who settled Boston in 1630 believed that children's welfare, on earth and in the afterlife, depended in large part on their ability to read and understand the Bible. The success of the colony also rested on a literate citizenry; men should be able to read and understand the laws governing them. The founders of Massachusetts Bay recognized that the next generation would need leaders who were learned in theology, philosophy, and government. For both religious and political reasons, then, the Puritans began almost immediately to establish schools.

58.      The first was the Boston Latin School opened in 1635, the nation's oldest publicly funded school. Unlike most schools in England, Boston Latin was not established by a church; it was created by the Boston Town Meeting. Voters agreed to use rents collected for Deer, Long, and Spectacle Islands in Boston Harbor to support the school and pay a schoolmaster. It was not long before Puritan leaders began to worry that many parents were not fulfilling this obligation. In 1642 the General Court passed a law that required heads of households to teach all their dependents — apprentices and servants as well as their own children — to read English or face a fine.

59.      Five years later, disturbed by what it perceived as persistent parental negligence, the General Court passed a more comprehensive law, the first to require that towns provide schools. All towns with 50 or more families were obligated to hire a schoolmaster to teach children to read and write. In towns of 100 or more families, the schoolmaster (who was usually a recent Harvard College graduate) had to be able to teach Latin as well. Responsibility for education was

shifting from the family to the town. The 1647 law eventually led to the establishment of publicly funded district schools in all Massachusetts towns.

60.        When John Adams drafted the Massachusetts Constitution in 1780, he included provisions that guaranteed public education to all citizens. In 1789 Massachusetts was the first state in the nation to pass a comprehensive education law. In updating the colony's 1647 law, the legislature required all teachers in grammar schools to "provide satisfactory evidence" that they had received a formal education in a college or university and, equally important, were of good moral character. Even women who taught neighborhood dame schools were to be certified by the selectmen.   Just as it had in the colonial period, Massachusetts continued to set the standard for public education in the new United States.

61.        In 1837, Massachusetts creates the first state Board of Education, after establishing the first public high school and free public school to all grades in the years leading up to the board's creation. The movement toward a statewide public education structure was initiated by Horace Mann, a state legislator who rose from humble beginnings to graduate from Brown University and become a champion for social reforms, including public education.

62.        In *McDuffy v. Sec'y of the Exec. Office of Educ.*, 415 Mass. 545, 617-18 (1993), the court held, in a prolix opinion, that there was a constitutional right to an adequate education set forth in Part II, Chapter 5, Section 2 of the Constitution of the Commonwealth.[21] The provision

---

[21] Massachusetts Constitution, part II, Chapter 5, Section 2: The Education Clause provides in pertinent part:

The Encouragement of Literature, etc.
Wisdom, and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures and magistrates, in all future periods of this commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge, public schools and grammar schools in the towns; to encourage private societies and public institutions, rewards and immunities, for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and a natural history of the country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and

that the legislature and the executive have a duty to "cherish" the schools in the towns carried the day. In 1780, the word "cherish" included the idea of support.  The court acknowledged that the right it identified was not stated in the Declaration of Rights, but instead appeared in Part II of the Constitution, which sets forth the obligations of the legislature and the executive.[22]

### B. *Doe v. Superintendent of Schools* Is Inapposite and Does Not Support the Imposition of a Flu Shot Mandate.

63.        We anticipate that the Respondent will rely on *Doe v. Superintendent of Schools*, 421 Mass. 117, 129-32 (1995), to assert that education is not a fundamental right of students who attend Massachusetts public schools. Such reliance is not well heard and inconsistent with nearly 400 years of history surrounding the importance of education in this state.

64.        In *Doe,* the Massachusetts Supreme Court had held that an individual student does not have a fundamental right to an education, and, therefore, the claim that the defendants denied the student substantive due process was not subject to strict scrutiny, but only to the rational basis test.  However, that decision was made in the context of a student who brought a weapon to school in violation of Massachusetts general law that provided little to no discretion to school officials in how they handled such matters in terms of expulsions and/or suspicions.

65.        In *Doe,* the student brought an appeal arising from her one-year expulsion from public school where a public-school principal had no discretion under General Law ch. 71, Section 37H, to expel the student who had violated the school's weapons policy.

66.        It is important to note that the Massachusetts Supreme Court limited its findings to the facts of that case, stating specifically:

"[The plaintiff] does not have a fundamental right to an education in the sense

---

frugality, honesty and punctuality in their dealings; sincerity, good humor, and all social affections, and generous sentiments among the people. [See Amendments, Arts. XVIII, XLVI, XCVI and CIII.]

[22] Id. at 566 n.23 (stating impact of clause placed elsewhere in Constitution rather than in Declaration of Rights).

asserted. The right which [she] does have is that of an equal opportunity to an adequate education, a right which she may lose by conduct seen to be detrimental to the community as a whole. The Legislature has made plain that school officials may exclude students such as [the plaintiff] who violate school rules which proscribe weapons possession in school. It is not difficult to see how such rules further the welfare of the school community."

*Id* at 129.

67.     Several important points are critical to the Court's analysis:  First, there is no legislative policy enacted with respect to mandatory flu vaccinations, as was the case involving weapons in the *Doe* matter. Second, the medical necessity of a flu vaccination is questionable, and the failure to obtain a flu vaccination has never before in the history of the State of Massachusetts been considered "conduct seen to be detrimental to the community as a whole".

68.     Therefore, *Doe* should be isolated to its unique facts involving weapons being brought to school in violation of state law, and not in the context of a vaccination that is not medically necessary, not required by any state statute, and is being used in a way to deny students due process, equal protection and their fundamental right to an education.

69.     A recent decision within the week from the Federal District Court for the Western District of Pennsylvania is dispositive on the issue of the level of review. In *County of Butler v. Thomas Wolf,* Civil Action No. 2:20-cv-677 (W.D. Penn September 13, 2020), the District Court held that certain executive orders issued by the Governor of Pennsylvania were unconstitutional by applying higher levels of scrutiny.

70.     Instructive was the Court's specific rejection of *Jacobson* v. *Massachusetts,* 197 U.S. 11, 31 (1905), and a rational basis level of review. In holding that "[o]rdinary constitutional scrutiny will be applied", the court stated:

While respecting the immediate role of the political branches to address emergent situations, the judiciary cannot be overly deferential to their decisions. To do so risks subordinating the guarantees of the Constitution, guarantees which are the patrimony of every citizen, to the immediate need for an expedient

18

solution. This is especially the case where, as here, measures directly impacting citizens are taken outside the normal legislative or administrative process by Res alone. There is no question that our founders abhorred the concept of one-person rule. They decried government by fiat. Absent a robust system of checks and balances, the guarantees of liberty set forth in the Constitution are just ink on parchment. There is no question that a global pandemic poses serious challenges for governments and for all Americans. But the response to a pandemic (or any emergency) cannot be permitted to undermine our system of constitutional liberties or the system of checks and balances protecting those liberties. Here, Defendants are statutorily permitted to act with little, if any, meaningful input from the legislature. For the judiciary to apply an overly deferential standard would remove the only meaningful check on the exercise of power.

Id. At page 20-21.

71.     What should be obvious is that the intent of the citizens of the State of Massachusetts, as express through numerous pieces of separate legislation, and as specifically expressed its history and citizens, is that the education of Massachusetts residents, and most specifically her children, is a fundamental right.

72.     Notwithstanding those cases dealing with funding schemes of local schools which implicate separation of powers doctrine, the instant case deals with a **regulatory** scheme that places a burden on children in order to exercise their fundamental right to an education. Such a scheme must be narrowly tailored, and pass strict judicial scrutiny, in order to be sustained.

73.     Because specific Constitutional rights are being violated by the flu shot mandate, the standard of review is Strict Scrutiny. Such regulation must have a compelling interest, and be narrowly tailored. Notwithstanding, and the aforementioned reasons as stated *infra*, this regulation fails even a rational basis test.

### III.     THE RIGHT OF PARENTS TO MAKE HEALTHCARE DECISIONS FOR THEIR CHILDREN

74.     Parents, and not the Governor or the Department of Public Health, are in the best position to determine whether or not their minor children should receive a medically unnecessary vaccination in order to attend school.

75.     The flu shot mandate requires minors to receive a medical treatment in order to attend school, whether such attendance is in person, or virtual.

76.     The flu shot mandate interferes with the parents' right to choose the medical decision and treatments for their minor children and violated the citizens' right to privacy as protected by the U.S. and Massachusetts Constitutions, and General Laws.

77.     The federal right to privacy can be found in the Fourteenth Amendment to the U.S. Constitution.[23]

78.     Whereas the Fourteenth Amendment's liberty protections extend to specific "zones of privacy"[24] (e.g., marriage,[25] procreation,[26] contraception,[27] abortion family,[28] relationships,[29] and child rearing and education[30]), the Massachusetts Constitution does not explicitly enumerate a right to privacy using the word "privacy."

79.     It does, however, under Article XIV of Part I, contain a provision akin to the Fourth Amendment to the U.S. Constitution, against unreasonable searches and seizures. This provision has been construed by Massachusetts courts in contexts related to the right to privacy vis-à-vis governmental actions, such as tracking of a person's movements via cell phone data. Privacy rights

---

[23] *See Griswold v Connecticut,* 381 U.S. 479 (1965) (recognizing an implicit right to privacy under the "liberty" protections of the Fourteenth Amendment to the U.S. Constitution).

[24] *Roe v. Wade*, 410 U.S. 113, 152 (1973).

[25] See *Obergefell v. Hodges*, 576 U.S. __ (2015); *Loving v. Virginia*, 388 U.S. 1 (1967).

[26] See *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); *Buck v. Bell*, 274 U.S. 200 (1927).

[27] See *Eisenstadt v. Baird* 405 U.S. 438 (1972).

[28] See *Planned Parenthood v. Casey*, 505 U.S. 833 (1992); Roe, 410 U.S. 113.

[29] See *Prince v. Massachusetts*, 321 U.S. 158 (1944).

[30] *Cleveland Board of Education v. La*Fleur, 414 U.S. 632 (1974); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebr*aska, 262 U.S. 390 (1923).

in the context of actions by non-governmental entities are generally addressed through other laws.

80.     Massachusetts has a general right to privacy law under §1B of Chapter 214 of Title I of Part III of the Mass. Gen. Laws ("the General Right to Privacy Law"), which provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."

81.     Massachusetts law contains a number of privacy related provisions that relate directly to the healthcare sector, including laws facilitating patients' access to their records and providing for confidentiality of certain health related information.

82.     Some of these protections are set forth in a "Patient Bill of Rights" under §70E of Chapter 111 of Title XVI of Part I of the Mass. Gen. Laws (the "Patient Bill of Rights"). More broadly applicable Massachusetts laws can also provide consumer protections, and impose obligations, regarding health-related data. For instance, the General Right to Privacy Law has been interpreted to mean that "disclosure of confidential medical information, in violation of [a] professional duty, can constitute an actionable tort, or an invasion of privacy actionable under §1B of Chapter 214 of Title I of Part III of the Mass. Gen. Laws."

83.     The Massachusetts Supreme Judicial Court has stated that there is "a strong public policy in Massachusetts that favors confidentiality as to medical data about a person's body." Consistent with that approach, Massachusetts law restricts the release and use of medical or health information in numerous contexts.

84.     Massachusetts case law also recognizes physicians' obligations to restrict disclosure of patient health information to third parties without patient consent.[31] Yet the flu shot mandate proscribes by its very nature violations of the parents' right to maintain the privacy of

---

[31] See e.g., *Alberts v. Devine*, 395 Mass. 59 (1985).

their children's medical records.

85.     The CDC and other agencies make clear that facemasks worn by children are not a substitute for social distancing.  If facemasks are compelled to worn, and the purpose of such thing is to avoid to spread of COVID-19, and yet social distancing is still required, it is hard to fathom how a flu shot that is totally unrelated to COVID-19 will do anything to avert the spread of COVID-19.

86.     The decision to obtain a medically unnecessary vaccine on behalf of their children is that of the parents to make, not the Governor, or the Department of Health, or the schools.

87.     Massachusetts law has traditionally recognized the right of parents to make health care decisions on their children's behalf, on the presumption that before reaching the age of majority, young people lack the experience and judgment to make fully informed decisions.

88.     A medically unnecessary flu vaccination, under these facts, is not one of those rare exceptions that permits the Government to overcome parental consent in the child's best interest.

89.     COVID-19 does not represent that level of imminent and immediate threat to minor children to allow the government to overcome the rights of the parents on this issue.

90.     Despite this, the Government is using this pandemic to increase its power and reach with a medically unnecessary requirement in order to obtain a right to an education- simply put, the flu shot mandate, under the guise of emergency powers under this pandemic, has no limiting principles, a fundamental Constitutional safeguard.

91.     Parents have the responsibility and authority to make medical decisions on behalf of their children. This includes the right to refuse or discontinue treatments, even those that may be life-sustaining.

92.     While most physicians believe it is in a child's best interest to receive the routine

childhood vaccinations and therefore recommend them to parents, they do not generally legally challenge parents who choose not to vaccinate their children. A parent may feel quite strongly that such a medical treatment is not in the child's best interest.

93.     In order to overcome the parents' right in determining a child's medical care, the policy must be one that is so compelling, that the life of child is in clear danger but for the treatment.  Such policy must be narrowly tailored and executed in only the most unique factual settings (e.g. lifesaving chemotherapy treatment; necessary blood transfusion; or kidney dialysis, to name a few). In light of the science that shows that minor children are highly unlikely to spread COVID-19, or to require hospitalization in the event they catch the virus, none of the factors normally required to overcome parental consent presently exist.

94.     Therefore, any mandatory rule that requires a medically unnecessary flu shot that interferes with parental consent is patently illegal and unconstitutional, because it interferes with the fundamental right of parents to make healthcare decisions for their children.

95.     As stated *infra,* there is little to no scientific evidence to support the proposition that minors are a source carrier of COVID-19.   Additionally, the overwhelming majority of children will choose to get the vaccination, thereby increasing herd immunity, which will mitigate their risk. However, the rights of others go only as far as the nose or arm of the Plaintiffs' minor children. The Plaintiffs have a right to determine what touches their child's body if it involves medical treatment, not the government.

A.     *Jacobson v. Massachusetts* **Is Inapposite and Does Not Support the Imposition of a Flu Shot Mandate.**

96.     It is anticipated that the State will rely on *Jacobson* to support their rationale. On February 20, 1905, the Supreme Court, by a 7-2 majority, said in *Jacobson v. Massachusetts* that the city of Cambridge, Massachusetts could fine residents who refused to receive smallpox

injections. In 1901, a smallpox epidemic swept through the Northeast and Cambridge, and Massachusetts reacted by requiring all adults receive smallpox inoculations or be subject to a $5 fine. In 1902, Pastor Henning Jacobson, suggesting that he and his son both were injured by previous vaccines, refused to be vaccinated and refused to pay the fine. In state court, Jacobson argued the vaccine law violated the Massachusetts and federal constitutions. The state courts, including the Massachusetts Supreme Judicial Court, rejected his claims. Before the Supreme Court, Jacobson argued that, "compulsion to introduce disease into a healthy system is a violation of liberty."

97.     On February 20, 1905, the Supreme Court rejected Jacobson's arguments.  Justice John Marshall Harlan wrote about the police power of states to regulate for the protection of public health: "The good and welfare of the Commonwealth, of which the legislature is primarily the judge, is the basis on which the police power rests in Massachusetts," Harlan said, "upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."

98.     The Court did not extend the rule beyond the facts of the case before it.  Justice Harlan ended his opinion by stating the limitations of the ruling: "We are not inclined to hold that the statute establishes the absolute rule that an adult must be vaccinated if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination or that vaccination, by reason of his then condition, would seriously impair his health or probably cause his death."

99.     In the years following the case, the anti-vaccine movement mobilized and the Anti-Vaccination League of America was founded three years later in Philadelphia under the principle that "health is nature's greatest safeguard against disease and that therefore no State has the right

to demand of anyone the impairment of his or her health," and aimed "to abolish oppressive medical laws and counteract the growing tendency to enlarge the scope of state medicine at the expense of the freedom of the individual." The League warned about what it believed to be the dangers of vaccination and allowing the intrusion of government and science into private life.

100.     When a separate question of vaccinations—state laws requiring children to be vaccinated before attending public school—came up in 1922 in *Zucht v. King*, 260 US 174 (1922), Justice Louis Brandeis and a unanimous court held that *Jacobson* "settled that it is within the police power of a state to provide for compulsory vaccination" and *Jacobson* and others "also settled that a state may, consistently with the federal Constitution, delegate to a municipality authority to determine under what conditions health regulations shall become operative."

101.     However, *Jacobson* involved compulsory vaccination in the midst of a smallpox epidemic when there was no other less coercive means available to staunch the outbreak.  In this situation, the court believed at that time that a vaccination was a medical necessity to combat the disease.  Compare this to vaccinations for sexually transmitted diseases like HPV- a compulsory vaccination is not a medical necessity because individuals can protect themselves through some combination of sexual knowledge, disease screening, safe sex, and abstinence. Likewise, a compulsory flu vaccine is also not a medical necessity, nor has the flu vaccine, which has been around for decades, ever been considered medically necessary.

102.     *Jacobson*'s reasoning and discussion of "necessity" became cemented in modern vaccine law. Broad challenges to compulsory vaccine laws ceased; challenges were instead limited to piecemeal applications for individual exemptions to vaccination laws. The anti-vaccine groups were quieted. But the introduction in recent years of two controversial vaccines — the hepatitis B and HPV vaccines — dramatically changed this trend toward general acceptance of compulsory

regimes. These vaccines combatted diseases that were different from those targeted by most vaccines that had come before, and many families felt that the vaccines should not be lumped together with established and historically reliable vaccinations for airborne diseases like smallpox.

103.     In short, what is at play here in this case is a matter of determining the line between medical necessity and practical necessity.   As a first step, determining whether a vaccine or drug can be categorized as a "medical necessity" or a "practical necessity" should help inform our legal analysis.

### IV.     THE RIGHT TO RELIGIOUS FREEDOM

104.     "There is no pandemic exception" to the Constitution. *Berean Baptist Church v. Gov. Roy A. Cooper, III*, No. 4:20-CV-81-D, at *2 (E.D.N.C. May 16, 2020).

105.     The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ."

106.     The Free Exercise Clause, incorporated or made applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees the Plaintiff the right to freely exercise his religion. *Hamilton v. Regents of the Univ. of California*, 293 U.S. 245 (1934), *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

107.     The Establishment Clause prohibits excessive government entanglement with religion, including showing favoritism between non-religious and religious activities.

108.     Article II of the Constitution of the Commonwealth of Massachusetts Declaration of Rights provides:

> It is the right as well as the Duty of men in society, publically, and at stated seasons of worship the Supreme Being, the Creator and preserver of the Universe. And no Subject shall be hurt, molested, or restrained in his person, Liberty, or Estate, for worshipping God

in the manner and season most agreeable to the Dictates of his own conscience, or for his religious profession or sentiments, provided he doth not disturb the public peace, or obstruct others in their religious Worship.

109.     While Massachusetts Dept. of Public Health Immunization Division documents reflect that a "religious exemption" to the flu shot mandate is still available, Massachusetts General Law Chapter 76, Section 15 states that: "*In the absence of an emergency* or epidemic of disease declared by the department of public health, no child whose parent or guardian states in writing that vaccination or immunization conflicts with his sincere religious beliefs shall be required to present [a physician's certificate confirming vaccination] in order to be admitted to school." Emphasis supplied.

110.     As long as the "State of Emergency" exception to religious exemptions exists, the flu shot mandate impermissibly infringes upon religious freedom, which is contrary to the most fundamental tenets of the U.S. and Massachusetts Constitutions.

## V.     <u>DUE PROCESS</u>

111.     The Fourteenth Amendment to the United States Constitution guarantees that states cannot "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV.

112.     "Part II, c. 1, Section 1, art. 4, of the Massachusetts Constitution, and arts. L, l O and 12 of its Declaration of Rights, are the provisions in our Constitution comparable to the due process clause of the Federal Constitution." *Milton Pinnick v. Carl Cleary,* 360 Mass. 1 (1971), Note 8.

113.     Article X guarantees "Each individual in society...the right to be protected by in the enjoyment of his life, Liberty and property, according to standing laws."

114.     "Procedural due process imposes constraints on governmental decisions which

27

deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976).

115.      Substantive due process rights concern the ability to enjoy fundamental freedoms without governmental interference. "Without doubt, [the Fourteenth Amendment] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923).

116.      Substantive due process is likewise protected under Article X of the Massachusetts Declaration of Rights. Under the Declaration of Rights, a state official violates procedural due process when he or she deprives a citizen of a constitutionally protected liberty or property interest and does so without a constitutionally adequate procedure. *Gillespie v. City of Northampton,* 460 Mass. 148, 153 n.12 (20 II).

**A.  The Flu Shot Mandate Deprives Citizens of their Right to an Education Without Due Process.**

117.      The flu shot mandate implies that students who do not comply with the vaccination regimen will be moved out of the public schools and into home schooling or no schooling at all. This is tantamount to an expulsion from the public school, and violates the student's right to an education, as discussed in considerable detail *infra*.

**B.  The Flu Shot Mandate Deprives Parents of Their Right to Privacy in Making Healthcare Decisions for Their Children Without Due Process.**

118.     Every person has an undeniable right of privacy, which includes the right to control his or her own body and be free of forced medical interventions. See e.g., *Cruzan v. Director, Missouri Dept of Health,* 497 US 261, 279 (1990).

119.     Like all rights, privacy is not absolute and must be balanced against other important rights. In the area of mandatory vaccination, the balancing test of these competing rights was first set out in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), which set out a clear red line on when a vaccine mandate *must* be struck down, warning the government that "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of courts to so adjudge, and thereby give effect to the Constitution."

120.     As detailed *infra*, the flu shot mandate cannot accomplish its proposed purpose, and thus should be treated as a violation of due process without any appreciable beneficial or protective effect on the population that it purports to protect.

## VI.     EQUAL PROTECTION

121.     Massachusetts Constitutional guarantee of equal protection and the U.S. Constitution's Fourteenth Amendment's guarantee of equal protection are substantially equivalent and analyzed in similar fashion.

122.     The Equal Protection doctrine has been defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness.

123.     Equal Protection refers to the idea that a governmental body may not deny people equal protection of its governing laws. The governing body state must treat an individual in the

same manner as others in similar conditions and circumstances.

124.    Courts have generally ruled that most classifications imposed by the government do not deny persons equal protection of the laws- generally, a legislature may make distinctions among people for any proper purpose, as long as the distinction is rational.[32]

125.    However, we are not dealing with a statute, but rather, an agency regulation pass by fiat without comment by the citizens upon which are compelled by it dictates to obey. In any case, there must be a logical relationship between the purpose of a rule and any classification of people that it makes. Without this "rational basis," a law will be struck down when challenged in court.[33]

126.    In the instant case, the flu shot mandate violates Equal Protection because:

a.  It treats students differently than non-students.

b.  It treats students over age 30 differently than students under age 30.

c.  It treats "eLearning" students working exclusively from home differently than homeschooled students working exclusively from home.

d.  It treats religious students differently than non-religious students.

127.    Here, because of the fundamental nature of the religious rights implicated, the proposed distinctions here must have a compelling interest, and be narrowly tailored, and pass strict scrutiny, which the flu shot mandate cannot do.

128.    The disparate and unequal treatment of these separate entities is not fully explained

---

[32] To pass the rational basis test, the statute or ordinance must have a legitimate state interest, and there must be a rational connection between the statute's/ordinance's means and goals.

[33] *Reed v. Reed*, 404 U.S. 71 (1971), the United States Supreme Court invalidated an Idaho statute that preferred males over females in the selection of a probate administrator. The Court explained that the equal protection issue was "whether a difference in the sex of the competing applicants for letters of administration bears a rational relationship to a state objective that is sought to be advanced by the operation of [the statute]." The Court concluded that it did not since it was arbitrary to prefer men over women merely to avoid hearings on the merits.

and has no rational basis.

## VII.   THE FLU SHOT MANDATE VIOLATES THE DOCTRINE OF UNCONSTITUTIONAL CONDITIONS

129.    The well-settled doctrine of unconstitutional conditions asserts that the government cannot condition a person's receipt of a governmental benefit on the waiver of a constitutionally protected right. See, e.g. *Commonwealth v. Dew* (Mass. Super. 2015) ("Although the Supreme Judicial Court did not use the phrase in O'Connor and LaFrance, it was applying 'the well-settled doctrine of 'unconstitutional conditions.' Cf. *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594 (2013), quoting *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994)").

130.    This doctrine "prevent[s] the government from coercing people into giving ... up" particular constitutional rights as a condition for obtaining some discretionary benefit or other advantage from the government. *Koontz* at 2594. By conditioning receipt of a benefit or advantage on the recipient agreeing not to exercise some constitutional right, "the government can pressure" people into "voluntarily giving up" constitutional rights that the government could not otherwise take away. *Id.* "Extortionate demands of this sort" frustrate individuals' constitutional rights, and therefore "the unconstitutional conditions doctrine prohibits them." *Id.* at 2595.

131.    "A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Koontz*, supra, at 2598.

132.    Here, the state government is flaunting this cornerstone rule by conditioning the receipt of a governmental benefit (here, an education) on the waiver of a number of constitutionally protected rights, including the right of religious freedom, the right of parents to make healthcare decisions for their children, and the right of children to an education.

133.    It is just and appropriate for the Court to intercede to disallow the Defendants from

violating one of the most basic tenets of constitutionality, the Doctrine of Unconstitutional Conditions.

## CLAIMS

### COUNT I: VIOLATION OF THE U.S. CONSTITUTION 5TH AND 14TH AMENDMENTS- DUE PROCESS

134.     Plaintiffs repeat and incorporate by reference paragraphs 1-133 as if set out fully herein.

135.     The Due Process Clause of the 14th Amendment to the U.S. Constitution, made applicable to the states via the 5th Amendment, provide that the government shall not deprive any person of their fundamental rights without due process of law.

136.     The flu shot mandate deprives Plaintiffs of the right to free exercise of religion, the right to an education, and the right of parents to make healthcare decisions for their children.

137.     The flu shot mandate was instituted without legislative process, without notice, and without giving Plaintiffs the opportunity to be heard before their rights were taken away, thereby depriving them of Due Process as guaranteed by the Constitution.

138.     These constitutional violations have resulted in significant and irreparable harm.

139.     A justiciable controversy has arisen between Plaintiffs and Defendants as to whether the aforementioned flu shot mandate violates the U.S. Constitution's 5th and 14th Amendment.

140.     Plaintiffs are entitled to injunctive and declaratory relief enjoining and invalidating the flu shot mandate.

### COUNT II: VIOLATION OF THE U.S. CONSTITUTION 1ST AND 14TH AMENDMENTS- FREE EXERCISE OF RELIGION

141.     Plaintiffs repeat and incorporate by reference paragraphs 1-133 as if set out fully

herein.

142.     On its face and as applied, the flu shot mandate violates the Plaintiffs' First Amendment right to the free exercise of religion. The overbroad, arbitrary, and indiscriminate application of the mandate on Plaintiffs' ability to practice their faith is not narrowly tailored, nor is it the least restrictive means to achieve the purported goal.

143.     On its face and as applied, the flu shot mandate is not neutral since it treats those desiring a religious exemption from the vaccine mandate differently than those who do not so desire.

144.     On its face and as applied, the flu shot mandate targets Plaintiffs' sincerely held religious beliefs by functionally prohibiting religious exemptions from the flu shot mandate by enforcing the "state of emergency" exception to the religious exemption.

145.     On its face and as applied, the flu shot mandate is neither neutral nor generally applicable.

146.     The Governor and the Commonwealth of Massachusetts lack a compelling interest in the flu shot mandate's application of different standards for those seeking a religious exemption.

147.     Even if supported by a compelling interest, the flu shot mandate is not the least restrictive means to accomplish the government's interest.

148.     The flu shot mandate is neither narrowly tailored nor is it the least restrictive means of accomplishing a compelling government interest.

149.     These constitutional violations have resulted in significant and irreparable harm.

150.     A justiciable controversy has arisen between Plaintiffs and Defendants as to whether the aforementioned flu shot mandate violates the U.S. Constitution's 1st and 14th Amendment.

151.     Plaintiffs are entitled to injunctive and declaratory relief enjoining and invalidating the flu shot mandate.

**COUNT III: VIOLATION OF THE 14TH AMENDMENT OF THE
U.S. CONSTITUTION AND THE MASSACHUSETTS
DECLARATION OF RIGHTS, ARTICLE I- EQUAL PROTECTION**

152.     Plaintiffs repeat and incorporate by reference paragraphs 1-133 as if set out fully herein.

153.     The Massachusetts Declaration of Rights, Article I, guarantees the right of equal protection to all persons under the law.

154.     The flu shot mandate violates Equal Protection because:

  a.     It treats students differently than non-students.

  b.     It treats students over age 30 differently than students under age 30.

  c.     It treats "eLearning" students working exclusively from home differently than homeschooled students working exclusively from home.

  d.     It treats religious students differently than non-religious students.

155.     The flu shot mandate violates the Equal Protection Clause as there is no legitimate, scientific, compelling, or rational basis to distinguish between students and non-students, between at-home eLearners and homeschoolers, between students over and under age 30, or between students whose religion prohibits vaccines and those whose religion does not so prohibit.

156.     These constitutional violations have resulted in significant and irreparable harm.

157.     A justiciable controversy has arising between Plaintiffs and Defendants as to whether the aforementioned flu shot mandate violates the U.S. Constitution 14th Amendment, Art. 1.

158.     Plaintiffs are entitled to injunctive and declaratory relief enjoining and invalidating

the flu shot mandate.

### COUNT IV: VIOLATION OF THE CONSTITUTION OF THE COMMONWEALTH OF MASSACHUSETTS DECLARATION OF RIGHTS, ARTICLES 1, IV, X, AND XII- DUE PROCESS

159.     Plaintiffs repeat and incorporate by reference paragraphs 1-133 as if set out fully herein.

160.     "Part II, c. 1, Section 1, art. 4 of the Massachusetts Constitution, and arts. 1, 10, and 12 of its Declaration of Rights are provisions in our Constitution comparable to the due process clause of the Federal Constitution." *Milton Pinnick v. Carl Cleary,* 360 Mass. 1 (1971), Note 8.

161.     The flu shot mandate deprives Plaintiffs of the right to free exercise of religion,[34] the right to an education, and the right of parents to make healthcare decisions for their children.

162.     Accordingly, the flu shot mandate violates the Plaintiffs' rights to due process under the Constitution of the Commonwealth of Massachusetts.

163.     These constitutional violations have resulted in significant and irreparable harm.

164.     A justiciable controversy has arising between Plaintiffs and Defendants as to whether the aforementioned flu shot mandate violates the Massachusetts Constitution.

165.     Plaintiffs are entitled to injunctive and declaratory relief enjoining and invalidating the flu shot mandate.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all issues so triable.

### CONCLUSION AND PRAYER FOR RELIEF

---

[34]  The Constitution of the Commonwealth, at Article 2, essentially bifurcates the right into freedom of belief and freedom of conduct. The Massachusetts Courts in employment law cases have found that the right to religious conduct is absolute so long as it does not disturb the peace or keep others from religious expression.  (Disturbance of public peace is defined as unreasonable disruptiveness plus infringement on someone's right to be undisturbed. *Commonwealth v. Orlando,* 371 Mass. 732 (1977).

WHEREFORE, pursuant to the foregoing points and authorities, Plaintiffs JOHN & DEANN HENRY; KAREN TALRICO; MARK MATHENA & CATHERINE HUFFMAN; ANDREA POLCARO; ADAM F. & KORIE L. CROSSMAN; AND MARK R. & NICHOLE J. GUSTAFSON respectfully request that the Court grant the following relief:

1. Declaratory judgement that enforcing the flu shot mandate against Plaintiffs and those similarly affected is unlawful and/or a violations of Plaintiffs constitutional and statutory rights;

2. Granting preliminary injunctive relief and thereafter permanent injunctive relief enjoining the Defendants and those in concert or active participation with them from enforcing the flu shot mandate against Plaintiffs and those similarly situated;

3. Award the Plaintiffs attorneys' fees and costs as authorized by Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and any other applicable law; and

4. Award such other relief as this Court deems just and equitable.

Date: November 12, 2020                    Respectfully submitted,


                                           /s/ Thomas O. Mason
                                           Thomas O. Mason, Esq.
                                           Law Office of Thomas O. Mason
                                           Massachusetts Bar #.: 559263
                                           19 Wells Place
                                           Lynn, MA 01902-1623
                                           Telephone (781) 599-2689
                                           Facsimile: (781) 599-6237
                                           Email: Tommason339@gmail.com

                                           And

                                           /s/ Patrick N. Leduc
                                           Patrick N. Leduc, Esq.

Florida Bar # 0964182
Law Offices of Patrick Leduc, P.A.
4809 E. Busch Blvd., Ste. 204
Tampa, FL 33617
Telephone: 813-985-4068
Facsimile: 813-333-0424
Email: Patrick.Leduc@ymail.com
*Subject to admission pro hac vice*

And

/s/ Luke Lirot
Luke Lirot, Esquire
Florida Bar # 714836
Luke Charles Lirot, P.A.
224 Belleair Road, Suite 190
Clearwater, Florida 33764
Telephone: (727) 536-2100
Facsimile: (727) 536-2110
Email: luke2@lirotlaw.com
Alternate email addresses:
sean@lirotlaw.com
krista@lirotlaw.com
*Subject to admission pro hac vice*

*Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Petition was served on November 12, 2020, in accordance the General Order on Electronic Case Filing (ECF) pursuant to the district's court's system as to ECF Filer, and that a written copy of this filing is served via U.S. Mail upon the following:

| | |
|---|---|
| Office of the Governor<br>c/o Robert Ross, Chief Legal Counsel<br>Massachusetts State House,<br>Beacon St #280,<br>Boston, MA 02133<br>*Counsel for Defendant Baker* | Elizabeth Scuria Morgan<br>Acting Gen. Counsel for the Mass. Dept.<br>of Public Health<br>250 Washington Street<br>Boston, MA 02108<br>*Counsel for Defendant Bharel* |

/s/ Thomas O. Mason
Thomas O. Mason, Esq.
Law Office of Thomas O. Mason
Massachusetts Bar #.: 559263